# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA,
### INDIANAPOLIS DIVISION

STEVEN M. WALTON,

        Plaintiff,

   *vs.*

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

        Defendant.

CAUSE NO.  1:15-cv-1736-DKL-JMS

## ENTRY

Plaintiff Steven M. Walton applied for disability benefits under the Social Security Act.  The defendant Commissioner of Social Security denied his applications and Mr. Walton filed this suit for judicial review of those denials.  The parties have briefed their positions and the matter is ready for decision.  Upon the parties' consents, the assigned district judge referred this Cause to this magistrate judge to conduct all proceedings and to order entry of a final judgment.  *Notice, Consent, and Reference of a Civil Action to a Magistrate Judge* [doc. 15].  This *Entry* explains the Court's reasons for ordering the separate judgment.

## Standards

Judicial review of the Commissioner's factual findings is deferential:  courts must affirm if her findings are supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  Substantial evidence is more than a scintilla, but less than a

preponderance, of the evidence. *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001). If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it is substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004). This limited scope of judicial review derives from the principle that Congress has designated the Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ [administrative law judge], we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner. Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). *Carradine*, 360 F.3d at 758. While review of the Commissioner's factual findings is deferential, review of her legal conclusions is *de novo*. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). A person will be determined to be disabled only if his impairments "are of such severity

that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."   42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  20 C.F.R. §§ 404.1505, 404.1566, 416.905, and 416.966.  The combined effect of all of an applicant's impairments shall be considered throughout the disability determination process. 42 U.S.C. §§ 423(d)(2)(B) and 1382c(a)(3)(G).  20 C.F.R. §§ 404.1523 and 416.923.

The Social Security Administration has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability.  If disability status can be determined at any step in the sequence, an application will not be reviewed further.  At the first step, if the applicant is currently engaged in substantial gainful activity, then he is not disabled.  At the second step, if the applicant's impairments are not severe, then he is not disabled.  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  Third, if the applicant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, Part A, then the applicant is deemed disabled.  The Listing of Impairments are medical conditions defined by criteria that the

Social Security Administration has pre-determined are disabling.  20 C.F.R. § 404.1525.  If the applicant's impairments do not satisfy the criteria of a listing, then her residual functional capacity ("RFC") will be determined for the purposes of the next two steps. RFC is an applicant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations and is categorized as sedentary, light, medium, or heavy, together with any additional non-exertional restrictions.  At the fourth step, if the applicant has the RFC to perform his past relevant work, then he is not disabled.  Fifth, considering the applicant's age, work experience, and education (which are not considered at step four), and his RFC, the Commissioner determines if he can perform any other work that exists in significant numbers in the national economy.  42 U.S.C. § 416.920(a)

The burden rests on the applicant to prove satisfaction of steps one through four.  The burden then shifts to the Commissioner at step five to establish that there are jobs that the applicant can perform in the national economy.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  If an applicant has only exertional limitations that allow her to perform the full range of work at her assigned RFC level, then the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"),  may be used at step five to arrive at a disability determination.  The grids are tables that correlate an applicant's age, work experience, education, and RFC with predetermined findings of disabled or not-disabled.  If an applicant has non-exertional limitations or exertional

4

limitations that limit the full range of employment opportunities at his assigned work level, then the grids may not be used to determine disability at that level.  Instead, a vocational expert must testify regarding the numbers of jobs existing in the economy for a person with the applicant's particular vocational and medical characteristics.  *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993).  The grids result, however, may be used as an advisory guideline in such cases.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a state-agency disability examiner and a physician or other medical specialist.  If the application is denied, the applicant may request reconsideration review, which is conducted by different disability and medical experts.  If denied again, the applicant may request a hearing before an administrative law judge ("ALJ").[1]  An applicant who is dissatisfied with the decision of the ALJ may request the SSA's Appeals Council to review the decision.  If the Appeals Council either affirms or declines to review the decision, then the applicant may file an action in district court for judicial review.  42 U.S.C. § 405(g).  If the Appeals Council declines to review a decision, then the decision of the ALJ becomes

---

[1] By agreement with the Social Security Administration, initial and reconsideration reviews in Indiana are performed by an agency of state government, the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration.  20 C.F.R. Part 404, Subpart Q (§ 404.1601, *et seq.*).  Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal Social Security Administration.

the final decision of the Commissioner for judicial review.

As they relate to this case, disability benefits are available through three programs under the Social Security Act.  Disability-insurance benefits ("DIB") are available to individuals who have become "insured" by working forty quarters and paying Social Security taxes.  Supplemental-security income disability benefits ("SSI") are available to individuals based on financial need.  Finally, an unmarried dependent child over the age of eighteen years is entitled to receive child's disability insurance benefits based on the earnings record of an insured parent who is entitled to disability benefits if the child has a disability that began before he became twenty-two years old.  42 U.S.C. § 402(d)(1); 20 C.F.R. § 404.350.

## Background

Mr. Walton's claims have taken a circuitous route to this point.  On September 14, 2007 (protective filing date of August 24, 2007),[2] he filed two applications:  one for DIB, based on his own earnings record, and one for SSI benefits.   (R. 235, 241.)  On January 7, 2008, he filed a third application, this one for child's insurance disability benefits based on his parents' earnings records.  (R. 392.)[3]  For his DIB claim, Mr. Walton declared an

---

[2] A protective filing date is established on the date that the Social Security Administration  either receives a written statement of intent to file for DIB or SSI benefits or receives, at specific locations, an oral inquiry about SSI benefits.  Social Security Administration, *Program Operations Manual System*, GN 00204.010 Protective Filing (effective July 23, 2015) (available at https://secure.ssa.gov/poms.nsf/lnx/ 02002040.10).

[3] The citation is to a receipt or a notification of confirmation number for his application.  No other documents related to this application appear to be included in the record.

onset-of-disability date of December 30 or 31, 1990. (R. 241, 309, 342.) For his SSI claim, he declared on onset date of January 1, 1987. (R. 235.) Because his child-disability application is not in the record, the onset date that it might have contained is unknown. However, as noted above, eligibility for child benefits requires that the child's disability began before his twenty-second birthday. Mr. Walton became twenty-two years old on May 12, 1984.

During the first hearing before an ALJ on his claims, Mr. Walton amended his onset date for his claims to January 10, 2008, and he and his counsel signed a motion to that effect. (R. 105-06, 274.) That date was chosen because it was the date of the first diagnosis in the record (as it was constituted at the time) by an acceptable medical source — a psychiatrist or psychologist — of a serious mental impairment[4] and because, at the time, earlier records of similar diagnoses rendered in the mid-1980s, when Mr. Walton was incarcerated, could not be obtained and were believed destroyed. (R. 103-13, 125-28.) The ALJ indicated that, if the missing prison medical records were found and submitted before she issued her decision, then she would consider them and not hold Mr. Walton to his amended date of onset and, if the records were submitted after her decision was issued, then he could appeal (presumably to the Appeals Council). (R. 107.) Apparently, Mr. Walton did not submit additional medical records before the ALJ issued her decision.

---

[4] That diagnosis was rendered by psychiatrist Jerry Fletcher, M.D. After examination, he diagnosed Mr. Walton with schizoaffective disorder, chronic, with residual symptoms. (R. 148.)

7

The ALJ issued her decision on February 25, 2010.  Initially, she dismissed Mr. Walton's DIB and child-disability claims because the amended onset date of January 10, 2008 rendered both claims moot:  that date was long after both May 12, 1984, Mr. Walton's twenty-second birthday, and March 31, 1998, the last day that he was insured for DIB. (R. 145.)  Proceeding on only Mr. Walton's claim for SSI benefits, the ALJ found, at step two of the sequential evaluation process, that Mr. Walton has the severe impairments of type II diabetes, obesity, and schizoaffective disorder, bipolar type.  At step three, she found that his impairments meet the criteria of listing 12.03 (schizophrenic, paranoid, and other psychotic disorders).  (R. 147.)  She found that the paragraph A severity criteria of the listing are satisfied because Mr. Walton has medically documented persistence, either continuous or intermittent, of delusions or hallucinations and she found that the criteria of paragraph B are satisfied because his impairments result in marked restrictions in activities of daily living and marked difficulties in maintaining social functioning. Because the listing criteria are satisfied, she found that Mr. Walton was disabled on his amended onset date of January 10, 2008.  (R. 148.)

On April 28, 2010, about two months after the ALJ's decision was issued, Mr. Walton submitted a request to the ALJ to reopen the hearing and a request for the Appeals Council to review the ALJ's decision.  (R. 215, 217.)  His letter to the ALJ and his letter accompanying his request for review explained that, after the hearing, he obtained his prison psychiatric records for the period from November 1986 to November 1987, (R.

554-71),[5] and that these records proved that he met or equaled the criteria for listing 12.05C ("mental retardation," then; "intellectual disability," now) before his date last insured for DIB, on his own record, March 31, 1998.  (R. 215, 218.)

In both of his letters, Mr. Walton specifically described three of the prison medical records.  First, the report of a psychiatrist's evaluation of Mr. Walton on November 7, 1986 noted that, in 1984 (no further identification of the date), Mr. Walton's IQ was tested at the Reception Diagnostic Center[6] and measured sixty-six, with a reading level at grade 3.5 and a math level at grade 2.3 grade.  (R. 570.)  The psychiatrist diagnosed him with acute paranoid disorder and mild mental retardation, prescribed Thorazine (which Mr. Walton refused), and recommended an emergency transfer to a psychology unit at another facility for treatment.  (R. 570-71.)  Mr. Walton was transferred the same day. Second, in the report of his psychological evaluation of Mr. Walton on November 18 and 19, 1986, a clinical psychologist at the transferee psychology unit diagnosed Mr. Walton with paranoid personality disorder and found it possible that he would decompensate into paranoid disorder and likely that he would reintegrate into anti-social personality. (R. 559.)  Third, in the report of his mental-status evaluation of Mr. Walton before his

_____

[5] When he received the records, in relation to the ALJ's decision, is not reflected in the record or the briefs.

[6] The Reception Diagnostic Center "is a maximum security intake facility for adult males sentenced to the [Indiana Department of Correction].  All adult males, including male offenders under 18 who were waived to adult court, are received at RDC, classified and transferred to long-term facilities." (www.in.gov/idoc/3180.htm)  "Intake facilities [of which there are two in Indiana:  the RDC, for men, and the Rockville Correctional Facility, for women] are designated to received newly committed adult offenders.  During the intake process each offender is evaluated through interviews, reports and diagnostic tests.    This evaluation forms the basis of the offenders' facility and program assignment." (www.in.gov/idoc/2332.htm)

release, a facility clinical psychologist wrote that Mr. Walton "seems at times to be borderline delusional in his relationship with others and at the very least confused about them." (R. 555.) This psychologist found that Mr. Walton's attention span was impaired, he blames others for his problems, he seems to be highly dependent on others, and he often assumes that he knows what others are thinking. He also found that Mr. Walton's orientation was good, his memory was efficient, his stream of thought was undisturbed, he has the ability to manage his daily living activities, and he has the ability to make reasonable decisions. *Id.*

In his letter to the ALJ seeking reopening of her decision, Mr. Walton also stated that his child-disability claim required proof of disability onset before age twenty-two, or by March 12, 1984, while his DIB claim required an onset date before his date last insured, or March 31, 1998. (R. 215.) But the letter stated that, because the newly obtained prison medical records show that his disability began before the DIB deadline, he is entitled to receive "Social Security Disability Insurance benefits," (R. 215, 216); he did not assert that the records show that Mr. Walton's disability began before he reached twenty-two years of age and, therefore, that he also is entitled to child-disability benefits. Mr. Walton's letter accompanying his request for Appeals Council review did not mention child-disability benefits or the March 12, 1984 eligibility date; it argued only that the new evidence showed that his disability began before his eligibility for DIB expired on March 31, 1998. (R. 218-19.)

The ALJ did not reopen her decision but the Appeals Council granted Mr. Walton's request for review.  It affirmed the ALJ's finding that he was disabled as of January 10, 2008, but vacated the decision with respect to the issue of disability before that date.  The Council recognized that Mr. Walton had amended his alleged date of onset only because the prison medical records before that date had not been obtained.  It found that the newly obtained prison medical records from 1986 and 1987 showed mental issues existing before Mr. Walton's date last insured of March 31, 1998, and, therefore, it decided to reopen Mr. Walton's claims.  The Council instructed the ALJ on remand to consider new and material evidence in order to determine the severity of Mr. Walton's impairments prior to January 10, 2008 and to issue a new decision with respect to disability before that date.  The Council did not specifically mention DIB, SSI, or child-disability benefits or restrict the ALJ on remand to an earliest possible onset date or to any closed period of consideration.

A new hearing was held on remand and a different ALJ issued two decisions:  one on DIB and SSI benefits and the other on child-disability benefits.  (R. 12 (DIB, SSI), 23 (child), 30 (child).)[7]  In the DIB/SSI decision, the ALJ found that Mr. Walton met the insured-status requirements for DIB benefits from October 1, 1997, to March 31, 1998.  At step two, he found that Mr. Walton has the severe impairment of borderline personality disorder.  He found that Mr. Walton's impairments did not meet or equal any of the

---

[7] Two decisions on child-disability benefits were issued.  They appear to be identical and the parties do not assert any material differences between them.

listings.  He found that Mr. Walton has the RFC to perform a full range of work at all exertional levels with the added nonexertional restrictions to simple and repetitive work, no reading or mathematics, and no more than superficial interaction with the general public, co-workers, or supervisors.  The ALJ found that Mr. Walton has "some decreased intellectual functioning and the record notes some paranoia and antisocial features, though not during the period [when] he meets the insured status requirements."  (R. 17.)  He imposed the three nonexertional RFC restrictions to accommodate his "borderline intellectual functioning and possible paranoia."  *Id*.  He found that there was "a lack of evidence during the pertinent period."  *Id*.

> The ALJ briefly discussed the prison medical records but he found as follows:
>
> While the claimant had a diagnosis of a paranoid personality disorder in 1986, there is no evidence that this continued to or through the period during which he was insured for benefits.  This was of acute onset and the record indicates his symptoms improved, he was going to activities and socializing with some peers.  he was subsequently released from prison and was able to engage in work activity, albeit intermittent and minimal for the most part.
>
> There is no source document for the 66 IQ referenced in the record.  There is no documentation in the record of deficits in adaptive functioning during the developmental period.

(R. 16.)  The last paragraph refers to the definitional criteria for satisfying listing 12.05, mental retardation:  "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. Part 404, Subpart P, Appendix 1, Part A, § 12.05.  Regarding the prison medical records,

the ALJ wrote:  "The records are from a remote period, twenty three years prior to the established onset, and there is no further treatment documented in the record until 2008. I have considered the Westville Correctional Center records and find they have no relevance to the later evidence of record."  (R. 18.)

At step four, the ALJ found that Mr. Walton had no relevant past work.  At step five, the ALJ found that there were a significant number of jobs in the national economy that he could perform with his RFC and vocational characteristics.  He concluded that Mr. Walton was not not under a disability during his insured period from October 1, 1997 through March 31, 1998 and that he was not disabled for SSI purposes before January 10, 2008, the onset date determined by the first ALJ.

In his child-disability decision, the ALJ acknowledged that Mr. Walton alleged that his disability commenced before he was twenty-two years old.  At step one, he found that, because Mr. Walton had demonstrated the ability to engage in substantial gainful activity after he attained age twenty-two years — earning $1,386.58 in 1988 and $11,776.03 in 1989, from landscape work — his claim must be denied.  (R. 25.)

The Appeals Council denied Mr. Walton's request to review the decision, (R. 1),[8] and he filed suit for judicial review, *Walton v. Astrue*, Cause no. 1:12-cv-688-JMS-TAB ("*Walton*") (complaint filed May 21, 2012).  After Mr. Walton had filed his opening brief,

---

[8] Mr. Walton requested review by letter and form dated October 26, 2010, four days after the ALJ's decisions.  (R. 5-8.)  Apparently, the Social Security Administration did not docket the request and Mr. Walton was resent his request in February 2012.  (R. 4.)  The Appeals Council issued its denial in April 2012.  (R. 1.)

he and the Commissioner reached an agreement to remand the case for reconsideration of specific matters. *Walton*, *Stipulation to Remand* [doc. 21] (Nov. 29, 2012). The Court ordered remand and entered judgment. *Id.*, *Order* [doc. 22], *Judgment* [doc. 23]; (R. 671). Adhering to the parties' agreement and agreed form, the Court ordered the Commissioner to take the following actions on remand:

    **1.** "re-evaluate psychiatric medical records dated November 12, 1986 through November 16, 1987, submitted subsequent to Plaintiff's administrative hearing, to consider whether a disability onset date earlier than January 10, 2008 is possible under Social Security Ruling (SSR) 83-20,"

    **2.** "re-assess the credibility of Plaintiff's subjective symptomatic complaints in accordance with SSR 96-7p,"

    **3.** "provide Plaintiff with the opportunity for a new administrative hearing,"

    **4.** "obtain medical expert testimony to assist in inferring a date of disability onset, if warranted under SSR 83-20, " and

    **5.** "issue a new decision as to the period from October 1, 1997 [the date that Mr. Walton first became insured for DIB on his own account] through January 9, 2008, based on the updated record."

(R. 671.) The stipulation and order do not mention separate determinations for DIB, SSI, and child-disability benefits. Instead, the Court ordered the Commissioner to determine whether an onset date earlier than January 10, 2008 can be determined, to obtain medical

expert testimony on inferring an onset date, and to make a "new decision" for the period from Mr. Walton's first date of eligibility for DIB and his previously amended onset date (which does not include the requisite date for child-disability benefits).

The same ALJ who held the second hearing held a third hearing on remand.  On July 23, 2013, he issued a decision on Mr. Walton's DIB and child-disability claims.  He wrote that his decision addressed "the claimant's Title II [DIB] disability claim on his own earnings as well [as] his Title II claims for child's benefits based on his parents' records. The claimant is alleging disability since October 1, 1997. **Per the remand order, this decision reflects the period of time from October 1, 1997 to January 9, 2008.**"  (R. 684 (original emphasis).)  The ALJ reiterated that Mr. Walton's date last insured was March 31, 1998, and that, for child benefits, disability must be established before he attained the age of twenty-two.  However, the ALJ mistakenly stated that Mr. Walton became twenty-two on October 1, 1997, the first day of the closed period that he was examining, (R. 686), instead of May 12, 1984.

At step two, the ALJ found that Mr. Walton has the severe impairments of borderline personality disorder and paranoid personality disorder.  At step three, he found that Mr. Walton impairments meet the criteria of listing 12.05D, mental retardation.  He found that the mental retardation manifested itself before age 22, based on his tested IQ between 60 and 70, and that his impairments cause marked restrictions in activities of daily living and marked difficulties in maintaining social functioning, (R. 687), which findings satisfy the criteria of listing 12.05D.   The ALJ discussed only the

1986-1987 prison medical "treatment records," (R. 687), and cited them as the only evidence supporting his conclusion that listing 12.05D was met:

> The treatment records above confirm that claimant had mental retardation which initially manifested before age 22 with a valid verbal, performance or full scale IQ score between 60 and 70. The treatment notes further confirm that the claimant's impairments caused at least two "marked" limitation or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the [*sic*] criteria of listing 12.05 are satisfied during the period of October 1, 1997 through January 9, 2008.

(R. 687.) The ALJ concluded that Mr. Walton is entitled to DIB, SSI, and child-disability benefits during the period October 1, 1997, to January 9, 2008. (R. 688.)

About one month later, on August 26, 2013, the ALJ issued a second decision amending his first decision because the first decision had "inadvertently" stated that Mr. Walton was entitled to child-disability benefits. Noting that a child's disability must have begun before attaining age twenty-two years, the ALJ found that he was not, in fact, entitled to child benefits: "[a]s the claimant was found to be disabled from October 1, 1997 to January 9, 2008, he is not entitled to Child Disability Benefits." (R. 699.)

Mr. Walton sought review by the Appeals Council but it found "no reason under our rules to assume jurisdiction." (R. 598.) However, in its decision, the Council declared that the ALJ properly denied child-disability benefits because Mr. Walton's disability had to have been established prior to May 13, 1984, and the ALJ found only that he was disabled during the "closed period" of October 1, 1997 to January 9, 2008. (R. 598-99.) It stated that the ALJ had "fully considered and evaluated the evidence and reached the appropriate conclusion on the issues regarding the finding of disability," and that his

16

amended decision complied with both the district-court and Appeals-Council remand orders. (R. 599.) Mr. Walton then filed this suit for judicial review.

### Discussion

Mr. Walton makes one argument: the record evidence shows that he satisfied listing 12.05C before his twenty-second birthday, May 13, 1984, and the ALJ's contrary finding, that he is not eligible for child-disability benefits because he was not found disabled until the "closed period" beginning October 1, 1997, is not supported by substantial evidence and is the result of legal error. The Commissioner counters that the 1986-87 prison medical evidence of "a mental impairment imposing an additional and significant work-related limitation of function," which is required, in addition to an IQ score of 60 through 70, to meet listing 12.05C, "was dated *after* his attainment of age 22 in May 1984." *Defendant's Memorandum in Support of the Commissioner's Decision* [doc. 26] ("*Response*"), at 8. Although she concedes that the ALJ found that "the prison mental health records from 1986 and 1987 indicated that the 12.05D criteria were satisfied, in that the impairments caused at least two marked limitations in areas of functioning," she argues that "those records do not establish that the criteria were satisfied before Plaintiff attained age 22 in May 1984." *Id.*, at 8-9. She also argues that Mr. Walton ignores the medical expert's testimony at the third hearing that the prison records showed marked limitations in social functioning and maintaining concentration, persistence, or pace for only the "closed period," not before Mr. Walton's twenty-second birthday. *Id.*, at 9.

The court concludes that the ALJ's finding that Mr. Walton is not entitled to child-disability benefits is erroneous.  In his first decision, the ALJ found that the 1986-87 prison medical records "confirm" that Mr. Walton had mental retardation which initially manifested before age 22 and those records "further confirm" that his impairments caused at least two marked limitations of function (which meant that the criteria of listing 12.05D were satisfied) during the period of October 1, 1997, through January 9, 2008.  (R. 687.)   Thus, the ALJ found that the prison medical records prove that the initial definitional criteria of the 12.00 listings for mental retardation — significantly sub-average general intellectual functioning, with adaptive-functioning deficits initially manifested before age twenty-two — are satisfied.  It is only the listings' severity criteria and the disability onset date that are at issue.

The ALJ also found that the prison medical records show:  (1) a psychiatric evaluation noted that Mr. Walton expressed paranoid delusions and seemed genuinely afraid; (2) he was diagnosed with acute paranoid disorder; and (3) a mental status evaluation "confirm[ed]" that he was borderline delusional in his relationships with others, his attention span was impaired, and he appeared to be highly dependent on others.  (R. 687.)  The ALJ found, based on an articulated evaluation of only the 1986-87 prison medical records, that Mr. Walton has the severe impairments of borderline personality disorder and paranoid personality disorder.  (R. 686.)  These and the other findings above directly relate to the criteria of 12.05C:  an IQ of 60 through 70 together with another mental impairment imposing an additional and significant work-related

18

limitation of function, *i.e.*, another "severe" impairment, which he found existed at step two.

Dr. Paul Wiese, psychologist, testified as the medical expert at the hearing.  The ALJ asked Dr. Wiese to summarize the psychological evidence "specifically as it pertains to the period from November 12, 1986 through November 16, 1987."  (R. 620.) Dr. Wiese answered that, coupled with Mr. Walton's diagnosis of paranoid personality disorder and possible psychotic disorder, not otherwise specified, he "certainly did have anti-social traits of a significant nature which include anti-social behaviors, poor judgment, fighting, lack of insights, lack of empathy for other, et cetera." (R. 621.)  He opined that that, "during that time period, there were sufficient symptoms to suggest that there was a psychosis and that falls under [listing] 12.03 [(schizophrenic, paranoid, and other psychotic disorders)] – in that time period." (R. 621.)  He also confirmed that the recorded 1984 IQ score was valid, given Mr. Walton's grade equivalence with regard to his reading and math levels.  (R. 622.)  The ALJ later directed Dr. Wiese's testimony to Mr. Walton's condition during the "closed period" and Dr. Wiese opined that the records show that Mr. Walton was disabled during that period as well, but he did not modify his opinion regarding the earlier time period or testify as to any factors that differentiated Mr. Walton's condition or disability during the two time periods.

Based on these findings, the ALJ found that Mr. Walton was entitled to DIB, SSI, and child-disability benefits for the period October 1, 1997 to January 9, 2008.  His sole basis for later eliminating Mr. Walton's entitlement to child-disability benefits is that his

finding that Mr. Walton was disabled during the "closed period" from 1997 to 2008 did not constitute a finding that he became disabled in 1984, before he attained the age of twenty-two, which is a prerequisite for child-disability benefits.  The ALJ believed that he was constrained to considering only this later closed period and was prohibited from determining whether Mr. Walton was disabled before his twenty-second birthday for two reasons.  First, he wrote that this Court's order of remand that concluded the previous suit limited him to issuing a new decision only regarding the closed period.  (R. 684.) Second, during the hearing, the ALJ stated that the issue of whether Mr. Walton was disabled before October 1, 1997 — including whether he was disabled in 1984 and, thus, entitled to child-disability benefits — already had been determined by a different judge, (R. 625, 627), and was, therefore, *res judicata*, "as [Mr. Walton's counsel] pointed out in the earlier hearing," (R. 629).  The ALJ was mistaken.

This Court's *Order* of November 30, 2012, remanding Mr. Walton's claims to the Commissioner on the parties' agreed motion, did not restrict the Commissioner to determining Mr. Walton's entitlement to disability benefits only during the "closed period" of October 1, 1997 to January 9, 2008, and it did not foreclose Mr. Walton's claim for child-disability benefits.  It is unfortunate that the parties, in their agreed motion and proposed order, and the Court, in its subsequent adoption of that that proposed order as its order of remand, did not provide specificity regarding Mr. Walton's separate claims for DIB, SSI, and child-disability benefits, and the ranges of possible onset dates for each. But it is clear that the terms of the remand order do not support the ALJ's narrow

interpretation of it.  The Court's first instruction to the Commissioner was to re-evaluate the prison medical records and consider whether they supported a disability onset date earlier than January 10, 2008.  That instruction and open onset start date allowed the Commissioner to find that Mr. Walton's disability began before his twenty-second birthday.  The Court's fourth instruction was to obtain, if warranted, medical expert testimony to assist in inferring an onset date, without mentioning any restriction to a date range or a particular disability program.  That instruction also permitted a finding that Mr. Walton's disability began before his twenty-second birthday.  The Court's fifth instruction was to make a new decision as to the closed period.  Because the start date of the period, October 1, 1997, was the date that Mr. Walton first became insured for DIB, that instruction is best understood as requiring a new decision as to Mr. Walton's entitlement to DIB during his insured period.  No reason has been advanced why the parties should have agreed to limit Mr. Walton's disability onset date to no earlier than his eligibility for DIB.  Mr. Walton's arguments throughout the administration of his claim, and especially after the prison medical records were obtained, certainly suggest that such an agreement would be unlikely.

As noted above, Dr. Wiese, the medical expert, testified specifically that the prison medical records showed that Mr. Walton's diagnoses of paranoid personality disorder and possible psychotic disorder, and his anti-social behaviors, poor judgment, and other symptoms, were sufficient to support a psychosis that falls under listing 12.03 during the time period from November 1986 through November 1987, which was the time period

about which the ALJ asked.  Dr. Wiese also opined that Mr. Walton's 1984 tested IQ of 66 was likely accurate and was lifelong, meaning that it also accurately represented his IQ in 1984, before his twenty-second birthday.  Even more, the ALJ found that the prison medical records proved that Mr. Walton's impairments satisfy a listing — although he felt himself constrained to apply that finding to only a much later period of time.  His only reason for not applying that finding to the period before Mr. Walton attained twenty-two years of age — a period much closer to the dates of the prison medical findings than the "closed period" — is that the records were dated after Mr. Walton's twenty-second birthday.  But it is a reasonable possibility that, if Mr. Walton satisfied a listing in November 1986, then he satisfied it two years earlier.[9]  S.S.R. 83-20.  There has been no determination by the Commissioner and no expert medical opinion in this case that Mr. Walton's disability did not, in fact, begin before his twenty-second birthday.  On the record as it exists, and on the ALJ's articulated determinations, a finding that Mr. Walton's disability did not begin before his twenty-second birthday solely because the evidence dates from two years later would not have a medical basis and would not be supported by substantial evidence.  The record could support a finding of disability onset before Mr. Walton became twenty-two years old and the Court's remand order did not constrain the ALJ's determination.

---

[9] The Court also notes that Mr. Walton testified at his first hearing that, during his teenage years, he was prescribed Thorazine, tranquilizers, and anti-depressants due to his paranoia and schizophrenia. (R. 99.)

The ALJ's statement during the hearing that the question of whether Mr. Walton's disability began before age twenty-two is *res judicata* is not supported by the record.  He referred to only "two prior applications that [Mr. Walton] filled out both of which . . . he did not appeal and they are long past since the time when those can be reopened."  (R. 629.)  Because nothing about the prior applications — *e.g.*, the dates they were filed, the claims that were made, the evidence that was presented, the dates and findings of the final decisions — were identified by the ALJ or otherwise made part of the present record, the Court cannot find that the ALJ's assertion is supported by substantial evidence or is legally correct.  The Court questions whether an earlier determination would preclude a new determination now that new and material evidence — Mr. Walton's prison medical records — was obtained and submitted during the pendency of the present application.  To the extent that the ALJ refused to determine whether Mr. Walton's disability began before October 1, 1997, because he found that the issue was *res judicata*, his finding was erroneous.

Therefore, the Court finds that the ALJ's denial of Mr. Walton's claim for child-disability benefits is erroneous, not supported by substantial evidence, and the result of legal error.  Specifically, the ALJ's refusal to determine whether Mr. Walton's disability began before he attained the age of twenty-two was erroneous.

Mr. Watson's claim for child-disability benefits will be remanded for reconsideration consistent with the above discussion and according to the following instructions:  **(1)** the Commissioner shall determine whether Mr. Walton's prison medical

records, other evidence in the current record, and any new evidence received on remand, show that Mr. Walton's disability satisfied the criteria of listing 12.05D and/or 12.05C before he attained the age of twenty-two; **(2)** the Commissioner shall render a new decision as to whether Mr. Walton is entitled to child-disability benefits; **(3)** because Mr. Walton argued only his entitlement to child-disability benefits in this suit, the Commissioner is not instructed to reconsider her decision on Mr. Walton's claims for SSI and DIB benefits; **(4)** the Commissioner is not precluded from again finding that the issue of whether Mr. Walton's disability began before age twenty-two (not whether he is entitled to benefits back to that time period) is *res judicata*, but, if she does, then she must assure that the record includes evidence of the previous decision or decisions that decided the issue and articulate why the new prison medical evidence does not warrant reopening the previous decision(s); **(5)** the Commissioner's finding that Mr. Walton's impairments meet the definitional criteria of listing 12.05 — *viz*., "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22" — is affirmed; **(6)** the Commissioner's finding that Mr. Walton's prison medical records and Dr. Wiese's testimony establish that Mr. Walton's impairments met the criteria of listing 12.05D, as of October 1, 1997, is affirmed; and **(7)** the Commissioner's finding that Mr. Walton has the severe impairments of borderline personality disorder and paranoid personality disorder, as of October 1, 1997, are affirmed.

24

**DONE this date:** 3/22/2017

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Distribution to all ECF-registered counsel of record *via* ECF-generated e-mail.